## Cumbow Land Co. v. Hardin.

(Decided March 22, 1938.)

HOWES & WALKER for appellant.

W. R. McCOY for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

A. L. Cumbow, doing business in the trade-name of Cumbow Land Company, brought this suit against B. F. Hardin, to recover on a $500 check. The jury found for Hardin, and plaintiff appeals.

The Cumbow Land Company is engaged in the business of selling real estate at auction. On March 14, 1936, it contracted with B. F. Hardin to sell at public auction a tract of land located in Inez, Martin county. The Cumbow Land Company was to receive as commission 10 per cent. of the gross sales and $100 to be applied on the expense of advertising, regardless of whether any sales of lots were made. The sale took place on the 18th day of April, 1936. After selling certain property, the sale was stopped. According to appellant, appellee stopped the sale because the lots were going too cheap. According to appellee, the sale was stopped because the bidders were known to be unable financially to comply with the terms of the sale. Three days later the check was executed and delivered to Cumbow and written thereon are the words, "For services rendered."

Besides other defenses, Hardin defended on the ground "that after entering into the contract of sale, plaintiff induced him to draw and deliver the check, and that the same was to be applied on plaintiff's commission for making the sale of the property aforesaid as provided in said contract, but that plaintiff, so far, has not made said sale as provided by said contract, and that by reason of said fact said check is and was without consideration." Its demurrer having been overruled, the Cumbow Land Company filed a reply denying the allegations of the answer, and pleading in substance that Hardin stopped the sale and became liable for damages, and that in full satisfaction and payment of the damages and the payment of the services theretofore performed, and for expenses previously incurred, the check was executed and delivered

Cumbow says that the check was a compromise settlement of everything that was due, and that Hardin

told him that if he deposited the check in Virginia, it would be good by the time it got back. The check was not paid, but was protested for insufficient funds. Prior to the receipt of the check, Cumbow had Hardin's note for $800. When Hardin delivered the check, the note was surrendered. Alexander Cameron, who was present when the check was given, says that the settlement was discussed in his presence; that the $800 note was torn up and the check given as a final settlement. According to Hardin, he asked appellant to stop for a while as sales were doing no good. When he gave Cumbow the check, he insisted on his going with him to see Judge Hardin so that he could make some arrangements whereby he could get the judge satisfied and pay the check. On being asked if, at the time he was induced to execute the check, it was his information that the Cumbow Land Company was going ahead and carry out the provisions of the sale contract, he said,

> "Well, I didn't figure whether they would or wouldn't—I figured when they come back in a period of about a week that they would figure out some proposition to work it through. And they never come back. He had my nephew there, William Hardin, in there when we was talking to them."

Hardin also testified as follows:

> "Wasn't the check given after the sale was made? A. Yes, I told you about the check—when the check was given. Q. That was in compromise settlement of the commission that Cumbow claimed you owed him, wasn't it? A. Yes."

W. H. Hardin, who bid on some of the property, and says that he was able to make his bid good if he gave him the deed, testified as follows:

> "Mr. Hardin, were you present when the check from B. F. Hardin to Mr. Cumbow or the Cumbow Land Company was made and given to Mr. Cumbow? A. Yes, I was.

> "Q. When was that? A. Well, it was on a date after the sale—I believe it was on Monday after the sale on Saturday—as I remember—Anyway, Cumbow agreed to come back here and have me to find a bidder and sell the hotel property and get enough money to make his commission—and he did come

back—and we went in the room—Uncle Ben didn't want to give this check and it went on along for about an hour and finally he did agree to come back and he would find his bidder,—I don't know, I told Uncle Ben and Cumbow and the man that was with him, that I didn't think he was going to find a bidder for the hotel property—there was a man from Johnson County by the name of Buck—somebody— he said he might find somebody at Paintsville—and Uncle Ben told him he would give him a check if he would get it fixed up by Saturday.

"The Court: What do you mean by 'get it fixed up by Saturday'? A. Uncle Ben told him that there wasn't any funds in the bank to meet the check and that he would have to sell the hotel property before the check could be paid off.

"The Court: Who was it that tried to get you to find a bidder? A. Mr. Cumbow. * * *

"Q. When did B. F. Hardin make this check to Cumbow? A. As I remember, it was on Monday —it could have been another day, but I believe it was on Monday.

"Q. Your father said on the check, it was given for services rendered? A. What check? .

"Q. I mean your uncle, B. F. Hardin, said on the check 'For services rendered,'—what services was it? A. For the selling of that tract of land over there. For their services they was to get a commission out of it, I don't know what their commission was to be.

"Q. And the check was given for that? A. It was put up as collateral for that in the event they would have the hotel property sold to some individual to make the check good.

"Q. What else was given as collateral? A. Not anything.

"Q. The check was given for services already rendered at the sale, and commissions on property sold? A. That was my understanding—Cumbow was to have that for commission in case this hotel was sold or enough property or enough was sold to pay it—Uncle Ben told him, at the time, he didn't

have any money in the bank to pay it unless he would go ahead and sell the property.''

Numerous other witnesses testified, but their evidence has no bearing on the matter in dispute.

In addition to an instruction authorizing nine of the jurors to make a verdict, the court instructed the jury as follows:

"The jury will find for the plaintiff $502.50 unless they believe and find from the evidence that at the time the check in question was given the consideration therefore was that plaintiff, Cumbow Land Company, was to complete the sales of certain lots mentioned in evidence and that said sales have not been completed, then you will find for the defendant, Hardin. If you do not so believe and find you will find for the plaintiff.''

On the question whether the consideration for the check was that appellant was to return and complete the sales, we have on the one hand Hardin's evidence that he figured they would come back in about a week and would figure out some proposition to work it through, coupled with the evidence of W. H. Hardin that his Uncle Ben told Cumbow that they would have to sell the hotel property before the check could be paid off. On the other hand, we have appellee's admission that the check was given in compromise settlement of the commission that Cumbow claimed he owed him, and the uncontradicted evidence of Cumbow and Alexander Cameron that Cumbow held appellee's note for $800 for the sale of the hotel property, and that the check was given in full settlement of everything that was owed. In addition to this, we have the fact that the check itself recites that it was given ''For services rendered.'' It may be doubted if appellee's own evidence shows that, when the check was given, there was an agreement on the part of Cumbow to return and complete the sales. The most that can be said is that appellee figured it that way. Not only so, but W. H. Hardin, who claims to have been present, testified simply to the fact that Cumbow was to return and find another bidder for the hotel property before the check was paid. But even if it be conceded that there was sufficient evidence to take the case to the jury, we are constrained to the view that the verdict is flagrantly against the evidence.

Several witnesses were permitted to testify, but they were not present when the check was given, and knew nothing whatever about the arrangements between appellee and appellant. On another trial their evidence will be excluded.

Judgment reversed and cause remanded for a new trial not inconsistent with this opinion.